IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF ALABAMA
SOUTHERN DIVISION

| | |
|---|---|
| **GIOZONDA A. PUGH O/B/O C.D.R** )<br>)<br>)<br>Plaintiff, )<br>)<br>vs. )<br>)<br>**MICHAEL J. ASTRUE, COMMISSIONER OF SOCIAL SECURITY,** )<br>)<br>)<br>)<br>)<br>Defendant. ) | Civil Action Number<br>**2:06-cv-1600-UWC** |

**MEMORANDUM OPINION**

Plaintiff brings this action pursuant to Section 205(g) of the Social Security Act, 42 U.S.C. § 405(g), seeking review of the final adverse decision of the Commissioner of the Social Security Administration ("SSA"). This Court finds the Administrative Law Judge's ("ALJ") decision, which has become the decision of the Commissioner is not fully supported by substantial evidence. Therefore, for the reasons elaborated herein, the Court will deny, in part, as well as remand the decision denying benefits.

**I.  Procedural History**

Plaintiff filed an application for disability insurance benefits on behalf of her minor son, C.D.R., on May 11, 2004. (R. 20.) This application was denied administratively at the initial and reconsideration stages. Plaintiff requested a hearing

before an ALJ, which was held on September 26, 2005, in Birmingham, Alabama.  (R. 10.)  On April 10, 2006, the ALJ denied the claim. (R. 17.)  This denial became the final decision of the Commissioner of the SSA when the Appeals Council refused to grant review.  (R. 2.)  Having timely pursued and exhausted her administrative remedies, Plaintiff filed an action for judicial review in Federal District Court pursuant to section 1631 of the Social Security Act, 42 U.S.C. § 1383(c)(3).

## II.  Factual Background

At the time of the AJL's decision, C.D.R., was nine years old and in the fourth grade.  He was not attended special education classes.  (R. 68, 123.)  C.D.R.'s alleged onset date is March 28, 1996, the year of his birth. C.D.R. suffers from asthma and attention deficit hyperactivity disorder ("ADHD").[1]  (R. 11.)

A February 2004 Psychiatric report indicated, *inter alia*, that C.D.R. was aggressive, he attacked other children, did not listen, talked back, and had a limited attention span.  (R. 113.)  By March and throughout early 2004, the medical records show his medications were working "good," his grades were good, he "now does his work," but he was "hyper" in the evening. (R. 111-112.)  There is some evidence that his physician believed he might be over medicated in May of that year.  (R. 96.)

His second grade teacher for the 2003 through 2004 school year, Ms. Smith completed a functional capacity evaluation reporting C.D.R. was an "average student"

---

[1] There is nothing in the record that might indicate C.D.R. is disabled due to his asthma.

who generally earned As, Bs, and Cs and "was on the same academic level" as his classmates. (R. 25.) She noted he understood her instructions, but did not follow them. (R. 26.) Although he did not interact well with his classmates, she typically saw a few students per year who had the same problem. (R. 26.) Finally, she noted that he was unable to sit still for an extended period of time and he occasionally talked back to adults. (R. 25-26.)

On a June 2004 report, C.D.R.'s grandmother reported that C.D.R did not have any problems communicating, hearing, or seeing. (R. 47-49.) She also reported that in the past he had experienced difficulty with learning. For example, he had problems reading, understanding simply sentences and understanding stories in a book. (R. 50.) She also noted that in the past, his impairment affected his behavior around others: he did not have friends his own age, could not make friends, and generally did not get along with others. (R. 51.) However, she qualified this response by noting that he had these problems when he was not on his ADD medication: "but now since taking [his medication] he's much better in all areas." (R. 52.) When asked to rate his ability to cooperate with others and take care of his daily needs, she said that prior to taking his medication he could not pay attention and stick with a task. (R. 53.) However, she concluded by noting "I, myself and [C.D.R.'s] teacher has seen a tremendous change, everything is okay now. But before Lord help my child it was terrible to even describe." (R. 53.)

3

A functional capacity report completed by his mother,[2] indicated he currently did not have any learning challenges and noted that his grades had improved since taking his ADHD medication. (R. 62.) When asked about his ability to interact with others, she said as long as he was taking his medication he was "very respectful." (R. 64.) When asked about his ability to help himself and cooperate with others, his only limitation was his ability to accept criticism or correction. (R. 65.) She also noted that without his medication he did not get along with anyone. (R. 65.) Finally, she noted that C.D.R. "has been doing excellent since he takes his [ADHD medication]." (R. 66.) On the last page of the report prepared by C.D.R's mother, Ms. Smith wrote a paragraph in which she states he had improved since being placed on medication. (R. 66.)

On August 14, 2004, at the beginning of third grade, C.D.R. returned to his physician where she noted he was doing better on his medication. (R. 94.) However, a November 20, 2004, report noted he was often staring and sitting alone, thereby indicating he was possibly over medicated. (R. 92.)

On January 24, 2005, his mother reported he was still isolating himself and staring into space. His physician noted "emotional instability." (R. 90.) Four months later, on April 1, 2005, he was doing great on his medication, but he was suffering side effects. (R. 88.) Thus, his physician reported his ADHD was not yet controlled and his medication was changed. (R. 88.) The following month, the records indicate school was

---

[2] It appears that C.D.R's mother completed the report, but had his Second grade teacher, Ms. Smith, include a paragraph on the report. (R. 58, 66.)

4

not going as well as when he had been on a different medication. (R. 87.)

An August 10, 2005, visit shows C.D.R. was on a "medicine vacation." (R. 85.) His mother reported his grades for the previous year (third grade) had been good, until the very end. (R. 85.) On October 12, 2005, C.D.R.'s mother indicated she believed his medication dosage needed increasing because he was not completing his work and his grades were dropping. (R. 83.) The physician reported "ADHD poor control," so she increased his dosage. (R. 83.) The following month, although C.D.R. complained of some physical ailments, his physician reported C.D.R.'s ADHD was "well enough controlled." (R. 79.)

Around this same time, his fourth grade teacher, Ms. Givens, completed a functional capacity report - she had been his teacher for two months at this juncture. (R. 28.) She reported no problems moving about and manipulating objects. (R. 32.) However, she observed he had an "obvious" problem acquiring and using information. She also noted that he did not pay attention and he did not listen to his teacher's instructions. (R. 29.) With respect to attending and completing tasks, she rated him as having an "serious" problem on six activities and having an "obvious" problem on six activities.

Her ratings on his ability to interact and relate to others varied. She noted he had a "slight" problem playing with others and respecting authority. He had an "obvious" problem seeking attention, following rules and interpreting facial expressions, hints and

body language.  He had a "serious" problem expressing anger appropriately.  (R. 31.) However, he had no problem making and keeping friends.  (R. 31.)

With respect to caring for himself, she noted he had no problem being responsible for taking his medications or using good judgment regarding personal safety and dangerous circumstances.  However, she noted, without explanation, that he did not take his medication on a regular basis.  (R. 34.)  She observed he had a slight problem identifying and appropriately asserting emotional needs and knowing when to ask for help.  Finally, he had an obvious problem handling frustration, being patient, and responding appropriately to changes in his own mood, such as calming himself and using appropriate coping sills.  (R. 33.)  She also noted that she might have to implement behavior modification strategies at a later time, such as developing a behavior plan.  (R. 31.)

On his first grading period in Ms. Givens' class, C.D.R. earned three Fs and one D. (R. 36.)  Ms. Givens commented that all of his folders had incomplete assignments, he was uncooperative, often forgot class materials and had low test scores.  (R. 36.)

At a September 2005 hearing, C.D.R's mother, Ms. Pugh, testified that C.D.R. was doing poorly in first grade, he improved in second grade, performed "okay" in third grade, but was not doing well in fourth grade.  (R. 122-27, 134-35.)  She also testified that when he takes his medication he is calmer, but otherwise he is always fighting and he will not sit still.  (R. 126.)  Indeed, on one occasion, he picked up a knife and threatened

to kill his sister. (R. 12.)

Even when he is on his medication, it wears off around 1:00 each day. (R. 126-27.) He did not have these problems previously when he was on different medication, but Medicaid would not pay for the medication. (R. 126-27, 135.) When the medication was changed, he performed well in school, but he acted like a "zombie," at which time his physician noted he was over medicated. Additionally, at one point his medication caused his blood pressure to increase. Therefore, his physician is still trying to find the right medication for him. (R. 126-27, 135.)

Finally, she testified that even when his grades were good, he had a discipline problem. (R. 136.)

After the administrative hearing, the ALJ found that Plaintiff suffers from severe impairments, but that the impairments do not meet or equal Listing 112.11. (R. 13.) Relying on the reports of C.D.R's teachers, his grandmother and his mother, the ALJ determined that Listing 112.11 was not met because his attention, hyperactivity, and impulsiveness are well below the "marked" level when he is on his medications.

Finally, the ALJ found that C.D.R. was less than marked functioning in the following domains: acquiring and using information, attending and completing tasks, interacting and relating with others, caring for himself, and health/physical well-being. (R. 14-16.) The ALJ found limitation on C.D.R.'s ability to move and manipulate objects. (R. 15.)

### III.  Controlling Legal Principles

A disability claimant has a heavy, but not insuperable, burden to establish entitlement to benefits.  *Mims v. Califano*, 581 F.2d 1211, 1213 (5th Cir. 1978).  The district court's standard or scope of review is limited to determining whether the substantial evidence support's the Commissioner's decision.  *Richardson v. Perales*, 402 U.S. 389, 390 (1971).  Additionally, the Court must determine whether proper legal standards were applied.  *Lewis v. Callahan*, 125 F. 3d 1436, 1439 (11th Cir. 1997) (citing *Walker v. Bowen*, 826 F.2d 996, 999 (11th Cir. 1987)).

Substantial evidence is more than a scintilla, but less than a preponderance.  It is such evidence a reasonable mind would accept as adequate to support a conclusion.  *See Martin v. Sullivan*, 894 F.2d 1520, 1529 (11th Cir. 1990); *Bloodsworth v. Heckler*, 703 F.2d 1233, 1239 (11th Cir. 1983).  In contrast, the Commissioner's legal conclusions are more closely scrutinized.  "The [Commissioner's] failure to apply the correct law or to provide the reviewing Court with the sufficient reasoning for determining that the proper legal analysis has been conducted mandates reversal."  *Cornelius v. Sullivan*, 969 F.2d 1143, 1145-45 (11th Cir. 1991).

Applicable agency regulations require a sequential evaluation of child disability claims.  The first step involves determining whether the child is engaged in substantial gainful activity.  If not, then the second step involves determining whether the child's condition is severe.  If the condition is severe, the third and final step involves

determining whether the impairment is disabling. A claimant may establish that her condition is disabling by showing that: 1) her impairment meets or medically equals a listing, or 2) her impairment is functionally equivalent to a listing. One method for establishing if an impairment is functionally equivalent to a listing is to show that the impairment results in "marked" limitations in two of six domains of functioning or "extreme" limitations in one of six domain domains of functioning:

   1) acquiring and using information,

   2) attending and completing tasks,

   3) interacting and relating to others,

   4) moving about and manipulating objects,

   5) caring for oneself, and

   6) health and physical well-being.

20 C.F.R. § 416.926a.

A "marked" impairment seriously interferes with the child's ability to initiate, sustain, or complete activities. Day-to-day functioning may be seriously limited when the impairment(s) limits only one activity or when the interactive and cumulative effects of the impairment(s) limit several activities. "Marked" limitation also means a limitation that is "more than moderate" but "less than extreme." 20 C.F.R. § 416.926a(e)(2).

### IV.  Analysis [3]

This Court must reverse the Commissioner's decision with respect to C.D.R's first grade year through February of 2004.  The medical records along with the testimony of C.D.R's mother and grandmother indicate that he experienced at least marked limitations in the areas of "acquiring and using information," "attending and completing tasks," and "interacting and relating to others" during his first grade year.  Indeed, Ms. Pugh sought medical help for C.D.R. by February of his second grade year.  (R. 113.)  However, by March his medications were working "good," and his grades were "good."  (R. 111-12.) Throughout the remainder of second grade he performed well and was "okay" during third grade.  Around the time he seemed to only be doing "okay," his medical records indicate problems with finding the proper medication and the proper dosage to control his ADHD.

By the beginning of fourth grade, the records do indicate he was again experiencing problems: his grades had bottomed out and his mother reported his medication did not work throughout an entire day.  The full extent of those problems, however, cannot be adequately determined because he had only been in school for two

---

[3]  The only argument raised in the Plaintiff's brief relates to purported deficiencies in the record.  However, there is nothing to indicate that such "deficiencies" are anything but ministerial. Plaintiff does not indicate that any of the records submitted to the SSA for consideration are missing from the record.

The Court notes that Ms. Pugh testified that she has sought additionally school records, but such records were no longer available.

months and there are no opinion reports from his treating physician regarding the level of his impairment. Accordingly, with respect to his condition beginning in fourth grade, this case will be remanded for a determination from C.D.R.'s treating physician regarding the extent of his impairment during the fourth grade year, as well as an updated report from his fourth grade teacher.

**V. Conclusion**

Therefore, by separate order, the decision denying benefits will be reversed and remanded for further proceedings.

Done this 29th day of February, 2008.

_____
U.W. Clemon
United States District Judge